UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Thomas C. Boudreaux,<br>　　　　　Plaintiff,<br><br>v.<br><br>Equifax Information Services, LLC;<br>JPMorgan Chase Bank, National<br>Association; and DOES 1 through 100<br>inclusive,<br><br>　　　　　Defendants. | §<br>§<br>§　CASE NO.5:22-cv-89<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

COMES NOW Plaintiff **THOMAS C. BOUDREAUX** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

### INTRODUCTION

1.　This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2.　Defendant JP Morgan Chase Bank, National Association ("JPMCB") is not reporting Plaintiff's account accurately as paid in full and satisfied.

3.　The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4.　Creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

5.　This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

6. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

7. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

8. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

9. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

10. Plaintiff alleges that the JPMCB account was current, paid in full, and fully satisfied in or about December of 2016, and thus should not be reporting with a past due payment status. Despite the fact the account was satisfied, JPMCB is reporting the account as currently past due which is patently incorrect and misleading.

11. Plaintiff alleges that it is patently incorrect and misleading for a debt which was current, paid in full, and fully satisfied to be reported on a credit report with a current payment status of past due as this reporting makes it appear as if the debt is still collectible.

12. Further, the tradeline does not mention the word "paid" anywhere. The past due payment status makes the account appear as if it were closed with an outstanding and past due amount, which is patently incorrect and misleading.

13. In the alternative, if any amount remained unpaid after the December 2016 payment, which Plaintiff denies, then said amount would have been included and discharged in Plaintiff's subsequent Chapter 7 bankruptcy filing. Even under this alternative scenario, Defendant's reporting is patently incorrect and misleading by not reporting the bankruptcy.

14. Plaintiff alleges that each and every Defendant is familiar with the FCRA requirements and subscribes thereto.

15. Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

16. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his Credit Score.

17. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

18. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    FICO, Inc.**

19. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

20. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.[1]

21. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

22. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

23. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

24. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

25. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See* https://www.myfico.com (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score".

26. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

27. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

28. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

29. Each of the five (5) factors is weighted differently by FICO.

30. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

31. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

32. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

33. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

34. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

35. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the filing date, under both Chapters, to determine how long ago the bankruptcy took place.

36. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit

number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

37. Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.     Metro 2**

38. The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

39. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner.

40. The CDIA's Metro 2 format is the credit reporting industry standard for credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of *maximum possible accuracy and completeness*.

41. The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt.

42. The CDIA is experienced in credit reporting. In support of this allegation, Plaintiff avers the following:

    a.    The CDIA offers a FCRA certificate program for all CRAs.

    b.    The CDIA offers a FCRA awareness program for all CRAs.

    c.    The CDIA offers a FCRA certificate program for DFs.

      d.       The CDIA offers a FCRA awareness program for DFs.

      e.       The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

      f.       The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

      g.       The CDIA developed a credit reporting resource guide for accurately reporting credit.

43. The CDIA's Metro 2 format is accepted by all CRAs.

44. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

45. When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

46. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

47. If the Metro 2 data received by FICO deviates from the FCRA requirements or industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**C.**     **e-OSCAR**

48. e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

49. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

50. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

51. When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

52. When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

53. For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**D.   Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

54. On June 16, 2021, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "June 16 Credit Reports").

55. Plaintiff noticed adverse tradelines in his June 16 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

56. Plaintiff then disputed the inaccurate tradelines regarding the account with JPMCB via certified mail to Equifax and TransUnion on or about July 19, 2021 (the "Dispute Letters").

57. Plaintiff's Dispute Letters specifically put JPCMB on notice that Plaintiff's account should not be listed as past due as it has a zero balance and is closed, and that Plaintiff's account should be updated.

58. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

59. Plaintiff is informed and believes that Equifax and TransUnion each received Plaintiff's Dispute Letters and, in response, sent Plaintiff's disputes to JPMCB, as the data furnisher, via an ACDV through e-OSCAR.

60. On September 20, 2021, Plaintiff ordered a second three-bureau credit report from Experian to determine if his accounts were updated.

   a.   **Inaccuracy – JPMCB**

61. Despite actual knowledge, JPMCB continued to report Plaintiff's account, beginning in 195283XXXXXXXX, to Equifax with a current payment status tradeline of "Not more than two payments past due". This tradeline is patently inaccurate as the account was paid in full and fully satisfied on or about December of 2016.

62. Plaintiff alleges that JPMCB did not investigate whether Plaintiff previously satisfied the account.

63. JPMCB did not update the tradeline to reflect that Plaintiff satisfied the account, and that it was not currently past due nor was it past due in December of 2016.

64. Equifax and TransUnion both provided notice to JPMCB that Plaintiff was disputing the inaccurate and misleading information, but JPMCB failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

65. The most basic investigation would include a simple review of internal documentation on the account (i.e., payments, including final payment and satisfaction) compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA regarding how to report a current debt legally paid in full.

66. Plaintiff alleges that JPMCB did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's account.

67. If JPMCB reviewed such standards, or its own internal records regarding Plaintiff's account, JPMCB would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

68. In the alternative, if Defendant believed there was an amount remaining unpaid after the December 2016 payment, which Plaintiff denies, then said amount would have been included and discharged in Plaintiff's subsequent Chapter 7 bankruptcy filed on November 20, 2018, and discharged on March 19, 2019. Under this alternative scenario, Defendant's should have reported the discharge, which it did not report.

69. By continuing to report Plaintiff's account to Equifax as described in paragraph 61, it appears to third parties viewing Plaintiff's credit report that Plaintiff did not pay of the debt in full but is instead currently behind on his payments, which in inaccurate. In the alternative, it appears as if Plaintiff had an outstanding, unpaid balance at the time of account closure, which is inaccurate.

70. Past due debts are far more injurious to a credit score than a debt paid in full and satisfied. Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the Credit Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

71. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's

credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status reported by JPMCB on the account is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

72. The lack of investigation and reporting of inaccurate and incomplete information by JPMCB is unreasonable.

**E.    Damages**

73. Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

74. As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

75. Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by JPMCB. Further, Plaintiff's low Credit Score, resulting from JPMCB's inaccurate reporting, has caused him to abandon his intentions to apply for certain credit.

76. JPMCB's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

77. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Equifax Failed to Assure Credit Reporting Accuracy**

78. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

79. Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the JPMCB account as described herein.

80. Equifax knew, or should have known, (1) that the JPMCB account was current, paid in full, and fully satisfied, and (2) that the account should not have been reported with a current payment status of "Not more than two payments past due" as the debt was current, paid in

full, and fully satisfied in or about December of 2016. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

81. Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers."[2] The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the reporting that Equifax allowed.

82. As a result of the Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.   Willful Violations**

83. Equifax's violations, as described herein, were willful; specifically, Equifax has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

84. Equifax regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, Equifax regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

85. To the extent Equifax does send consumer disputes, they send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

86. Equifax's employees receive little to no training concerning how to accurately report consumer debt.

87. Instead, Equifax's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

88. Equifax's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

---

[2] *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019).

89. Equifax has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

90. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

91. Equifax's violations were willful, rendering it individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

92. In the alternative, Equifax was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

93. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

**(Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))**

**(Against Defendants and Does 1-100)**

94. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     JPMCB Failed to Reinvestigate Following Plaintiff's Dispute**

95. Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

96. After the account was current and fully satisfied in or about December of 2016, JPMCB sent an AUD to Equifax and TransUnion reporting the payment status at that point in time (i.e., post satisfaction) as past due.

97. After receiving the Dispute Letters, JPMCB did not correct the payment status, but instead verified and re-reported the current payment status as past due via ACDV to Equifax.

98. The payment status reported in an AUD or ACDV represents the status of the account at the time of sending the AUD or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, even in the event the account

was previously past due, if at all, it has no bearing on its *current* pay status after the account was paid in full and fully satisfied.

99. JPMCB violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

100. Equifax and TransUnion provided notice to JPMCB that Plaintiff was disputing the inaccurate and misleading information; however, JPMCB either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

101. In the alternative, in the event Equifax failed to comply with its statutory duty to forward Plaintiff's dispute letter to JPMCB and JPMCB only received an ACDV from TransUnion, JPMCB still had a duty to correct and update reporting to all credit bureaus under 15 U.S.C. § 1681s-2(b)(1)(D), which it failed to do.

102. Based on Plaintiff's disputes, its corrected reporting to TransUnion, and review of its internal records on the account, JPMCB should have known its account was current, paid in full, and fully satisfied in or about December of 2016 and ceased its inaccurate reporting.

103. Reporting a current and fully satisfied and/or paid debt as currently past due is patently incorrect.

104. In addition, this inaccurate reporting also adversely affects credit decisions. Payment history (including payment status), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported Credit Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, JPMCB's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and his ability to rebuild his credit score and obtain new credit.

105. The lack of investigation by JPMCB, as required by the FCRA, is unreasonable.

**B.     Willful Violations**

106. Plaintiff alleges that JPMCB has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

107. Plaintiff further alleges that JPMCB has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, have developed reckless policies and procedures.

108. Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, JPMCB's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

109. In the alternative, JPMCB was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

C. **Equifax Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

110. Pursuant to 15 U.S.C. 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the JPMCB account.

111. Thus, Equifax failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the account within the statutory time frame.

112. Equifax is not a passive entity bound to report whatever information a data furnisher provides.

113. Plaintiff alleges Equifax is readily familiar with FCRA requirements and credit reporting industry standards.

114. Based on the foregoing, Plaintiff alleges that Equifax can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

115. Equifax can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

116. Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that JPMCB was not reporting its account at issue correctly.

117. Had Equifax conducted a proper investigation, it could have closed or bookended the JPMCB debt by adding a notation on the credit report to show that the debt was in fact fully satisfied and not past due. However, Equifax continued to report the account as described herein.

118. Equifax, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

119. In the alternative, Plaintiff alleges that Equifax did not send an ACDV to JPMCB to confirm accurate reporting on its account. Despite receiving the Dispute Letter providing notice of the inaccuracies, Equifax did not delete or correct the tradeline or conduct an investigation.

120. In the alternative, if Equifax deemed Plaintiff's Dispute Letter "frivolous or irrelevant" under 15 U.S.C. 1681i(a)(3), Equifax failed to notify Plaintiff of such determination as required by 15 U.S.C. 1681i(a)(3)(B). As Plaintiff received no such notice from Equifax, Plaintiff alleges Equifax deemed her Dispute Letter valid, and thus triggered its obligations under 15 U.S.C. 1681i(a)(1) and (2)(A), for which it did not comply.

### THIRD CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
### (Against Defendants and Does 1-100)

121. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Equifax Failed to Review and Consider all Relevant Information**

122. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

123. Equifax's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

124. Equifax's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

125. In the alternative, Equifax was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

126. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

127. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Equifax Failed to Delete Disputed and Inaccurate Information**

128. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

129. Equifax's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

130. Equifax's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

131. In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

132. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

133. WHEREFORE, Plaintiff prays for judgment as follows:

   a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
   b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;
   c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;
   d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;
   e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

  f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

                Respectfully submitted,

                **SCHUMACHER LANE PLLC**

Dated: February 1, 2022       */s/ Kyle Schumacher*
                Kyle Schumacher
                Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.

**SCHUMACHER LANE PLLC**

Dated: February 1, 2022

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiff